# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 19, 2010          Decided March 18, 2011

No. 09-7109

ASID MOHAMAD, INDIVIDUALLY AND FOR THE ESTATE OF
AZZAM RAHIM, ET AL.,
APPELLANTS

v.

JIBRIL RAJOUB, ET AL.,
APPELLEES

———

Consolidated with 09-7158

———

Appeals from the United States District Court
for the District of Columbia
(No. 1:08-cv-01800)

———

*Robert J. Tolchin* argued the cause and filed the briefs for appellants.

*Laura G. Ferguson* argued the cause for appellees. With her on the brief was *Kevin G. Mosley*. *Richard A. Hibey* and *Mark J. Rochon* entered appearances.

Before: GINSBURG, TATEL and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GINSBURG.

GINSBURG, *Circuit Judge*: The sons and widow of Azzam Rahim sued the Palestinian Authority and the Palestine Liberation Organization for damages on behalf of Rahim's estate. The plaintiffs alleged the defendants tortured and killed Rahim in violation of both the Torture Victim Protection Act (TVPA), 28 U.S.C. § 1350, note § 2(a), and federal common law. The district court granted the defendants' motion to dismiss, concluding only a natural person is amenable to suit under the TVPA and the Rahims had no cause of action under federal common law. We affirm the judgment of the district court.

## I. Background

Because the district court dismissed this case on the basis of the complaint alone, we assume for the purpose of this appeal that the allegations therein are in all respects true. *Meijer, Inc. v. Biovail Corp.*, 533 F.3d 857, 865–66 (D.C. Cir. 2008). According to the complaint, Azzam Rahim, a Palestinian born and raised in the West Bank, became a citizen of the United States after moving here in the 1970s. The events in suit took place when Rahim visited the West Bank in 1995. While he was sitting in a coffee shop, some two to four men, who identified themselves as security police, forced him into an unmarked car. They took Rahim to a prison in Jericho, where he was tortured and eventually killed. In 1996 the U.S. Department of State issued a report on human rights practices in the West Bank since Israel had transferred certain responsibilities over the area to the Palestinian Authority. The report stated that Rahim had "died in the custody of PA intelligence officers in Jericho."

The Rahims initially filed suit in the U.S. District Court for the Southern District of New York. In 2007 that court entered a default against the defendants, neither of which had answered the complaint.[*] After the defendants moved to vacate the entry of default and to dismiss the Rahims' complaint for, among other reasons, lack of personal jurisdiction in that district, the court granted the Rahims' motion to transfer the case to the District Court for the District of Columbia, where the defendants renewed their motions to vacate the entry of default and to dismiss the Rahims' complaint.

Granting the defendants' motions, the district court set aside the entry of default and dismissed the case pursuant to Federal Rule of Civil Procedure 12(b)(6), holding the plaintiffs have no cause of action under either the TVPA or federal common law. *Mohamad v. Rajoub*, 664 F. Supp. 2d 20, 22–24 (D.D.C. 2009). The Rahims now appeal.

## II. Analysis

The plaintiffs present three issues on appeal: (1) whether the district court abused its discretion in vacating the entry of default, *see Jackson v. Beech*, 636 F.2d 831, 835 (D.C. Cir. 1980), and, if not, whether the Rahims have a cause of action under (2) the TVPA or (3) federal common law. We review the latter two issues de novo. *See Rochon v. Gonzales*, 438 F.3d 1211, 1216 (D.C. Cir. 2006).

## A. Setting Aside the Default

First, we hold the district court did not abuse its discretion in setting aside the default entered against the

---

[*] No judgment was ever entered upon the default.

4

defendants pursuant to Federal Rule of Civil Procedure 55(c), which rule permits a district court to "set aside an entry of default for good cause." *See also Jackson*, 636 F.2d at 836 ("strong policies favor resolution of disputes on their merits"). In exercising its discretion, the district court is supposed to consider "whether (1) the default was willful, (2) a set-aside would prejudice plaintiff, and (3) the alleged defense was meritorious." *Keegel v. Key West & Caribbean Trading Co.*, 627 F.2d 372, 373 (D.C. Cir. 1980). In this case, the district court did not say why it granted the defendants' motion to vacate but, as it happens, we need not remand the case because the Rahims' only argument against setting aside the default is that the defendants presented no "meritorious defense" to this action.

As the defendants note, "allegations are meritorious if they contain even a hint of a suggestion which, proven at trial, would constitute a complete defense." *Id.* at 374 (internal quotation marks and citations omitted). The defendants far surpassed this standard, as will be seen in what follows.

B. The Torture Victim Protection Act

The TVPA was enacted in 1992 in order to create "a civil action for recovery of damages from an individual who engages in torture or extrajudicial killing." Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350, note). The relevant provision of the TVPA states:

> (a) Liability.--An individual who, under actual or apparent authority, or color of law, of any foreign nation--

> > (1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or

> (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any person who may be a claimant in an action for wrongful death.

28 U.S.C. § 1350, note § 2(a). The defendants argue the district court properly dismissed the Rahims' claim under the TVPA because this provision does not create a cause of action against an organization, as opposed to a natural person.

We begin our inquiry, as always, with the text of the statute. *Bismullah v. Gates*, 551 F.3d 1068, 1072 (D.C. Cir. 2009). The Rahims claim the Palestinian Authority and the PLO are amenable to suit under the TVPA because the word "individual," in referring to the perpetrator of torture or of extrajudicial killing, includes organizations. The Rahims' authority for this proposition is limited to the observation that the term "individual" is "consistently viewed in the law as including corporations." *Sinaltrainal v. Coca-Cola Co.*, 256 F. Supp. 2d 1345, 1359 (S.D. Fla. 2003) (holding corporation may be sued under TVPA), *aff'd in relevant part*, 578 F.3d 1252, 1264 n.13 (11th Cir. 2009); *see also Romero v. Drummond Co.*, 552 F.3d 1303, 1315 (11th Cir. 2008) (TVPA "allows suits against corporate defendants"); *United States v. Middleton*, 231 F.3d 1207, 1210 (9th Cir. 2000) (statute making it a crime to access certain computers and thereby cause damage to "one or more individuals" applies to injured corporations). The defendants, for their part, argue "individual" should be understood in its ordinary sense, meaning only a natural person. *See, e.g.*, *In re North* (*Gadd Fee Application*), 12 F.3d 252, 254–55 (D.C. Cir. 1994) ("individual" as used in the fee provision of the Ethics in Government Act describes only natural persons).

We agree with the defendants.  Because the Congress did not define the term "individual" in the TVPA, we give the word its ordinary meaning, *Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995), which typically encompasses only natural persons and not corporations or other organizations, *North*, 12 F.3d at 254 ("In common usage, 'individual' describes a natural person") (citation omitted); *cf. Clinton v. City of New York*, 524 U.S. 417, 428 n.13 (1998) ("'person' often has a broader meaning in the law" than does "individual").  Notably, the Dictionary Act, which provides guidance in "determining the meaning of any Act of Congress," strongly implies the word individual does not comprise organizations because it defines "person" to include "corporations, companies, associations, firms, partnerships, societies,... *as well as individuals*."  1 U.S.C. § 1; *see also Bowoto v. Chevron Corp.*, 621 F.3d 1116, 1126–27 (9th Cir. 2010) (through the Dictionary Act, the "Congress has directed courts to presume the word 'individual' in a statute refers to natural persons and not corporations").

The Rahims nonetheless argue the term "individual" is at least ambiguous, wherefore the court should look to the purpose of the TVPA, which supports liability for organizations.  Quoting *Kadic v. Karadzic*, 70 F.3d 232, 241 (2d Cir. 1995), they reason that because the Congress enacted the TVPA in order "to codify the cause of action" recognized by the Alien Tort Statute, 28 U.S.C. § 1350, and to "extend that cause of action to plaintiffs who are U.S. citizens," and because the ATS permits a plaintiff to sue an organization, the TVPA must do also.  *See Sinaltrainal*, 578 F.3d at 1263 ("corporate defendants are subject to liability under the ATS").  *But see Kiobel v. Royal Dutch Petroleum Co.*, 621

F.3d 111, 120 (2d Cir. 2010) (ATS does not confer jurisdiction over claims against corporations).[*]

We reject the Rahims' argument because the structure of the TVPA confirms what the plain text of the statute shows: The Congress used the word "individual" to denote only natural persons. The liability provision of the statute uses the word "individual" five times in the same sentence — four times to refer to the victim of torture or extrajudicial killing, which could be only a natural person, and once to the perpetrator of the torture or killing. § 1350, note § 2(a). The Rahims advance no cogent reason, and we see none, to think the term "individual" has a different meaning when referring to the victim as opposed to the perpetrator. *See Bowoto*, 621 F.3d at 1127 ("There is no indication Congress intended 'individual' to have a variety of meanings throughout the TVPA"); *Comm'r v. Lundy*, 516 U.S. 235, 250 (1996) ("the normal rule of statutory construction" is "that identical words used in different parts of the same act are intended to have the same meaning") (internal quotation marks and citations omitted). We note also the liability provision uses the word "person" in reference to those "who may be a claimant in an action for wrongful death," § 1350, note § 2(a)(2); because a claimant could be a non-natural person, such as the decedent's estate, this further supports the significance of the Congress having used "individual" rather than "person" to identify who may be sued under the TVPA.

To be sure, there are, as the Rahims note, situations in which the same word in a single statute has a different scope, depending upon its precise context. They point to *Weaver v.*

---

[*] The issue whether corporations may be held liable in a suit brought under the ATS is pending before this court in *Doe v. Exxon Mobil Corp.*, No. 09-7125 (D.C. Cir. argued Jan. 25, 2011).

*U.S. Information Agency*, 87 F.3d 1429 (D.C. Cir. 1996), where this court said, "Identical words may have different meanings where the subject-matter to which the words refer is not the same ..., or the conditions are different, or the scope of the legislative power exercised in one case is broader than that exercised in another," *id.* at 1437 (internal quotation marks and citation omitted). Because none of those conditions obtains here, the more applicable statement in *Weaver* is the topic sentence of the same paragraph: "Normally, the same word appearing in different portions of a single provision or act is taken to have the same meaning in each appearance." *Id.*

In their reply brief, the Rahims for the first time argue in the alternative the defendants are secondarily liable for Rahim's death either pursuant to the principle of respondeat superior or for aiding and abetting his killer(s). *See Sinaltrainal*, 578 F.3d at 1258 n.5 ("the TVPA permits aiding and abetting liability"); *but see Bowoto*, 621 F.3d at 1128 (rejecting argument plaintiffs could sue corporation "under the TVPA upon a theory of 'aiding and abetting'"). This argument comes too late. *Sitka Sound Seafoods, Inc. v. NLRB*, 206 F.3d 1175, 1181 (D.C. Cir. 2000) ("In order to prevent ... sandbagging of appellees and respondents, we have generally held that issues not raised until the reply brief are waived") (internal quotation marks and citation omitted). In any event, we doubt the Rahims could prevail upon such a theory of liability. As the Ninth Circuit observed, even if we assume some form of vicarious liability is possible, the text of the TVPA still "limits such liability to individuals," *Bowoto*, 621 F.3d at 1128, and we have already seen that in this statute "individual" comprises only natural persons.

In sum, we hold the TVPA does not permit a suit against either the Palestinian Authority or the PLO. Accordingly, we

affirm the judgment of the district court dismissing the Rahims' claim under the TVPA.

C. Federal Common Law

The Rahims also advance a claim against the Palestinian Authority and the PLO under "customary international law, as a part of federal common law," over which this court has federal-question jurisdiction pursuant to 28 U.S.C. § 1331. In response, the defendants maintain the Supreme Court's opinion in *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), precludes such a claim. They also rely upon a recent Ninth Circuit decision, *Serra v. Lappin*, 600 F.3d 1191 (2010), in which the court rejected the idea that any federal statute other than the ATS "recognizes a general cause of action under the law of nations." *Id.* at 1197, 1197–98 n.7 ("If any plaintiff could bring any claim alleging a violation of the law of nations under federal-question jurisdiction, there would be no need for statutes such as the ATS and the [TVPA], which recognize or create limited causes of action for particular classes of plaintiffs (aliens) or particular violations (torture)").

As the defendants note, the Supreme Court in *Sosa* cautioned against reading § 1331 to imply a federal common law claim for a violation of the law of nations. One issue in that case was whether the plaintiff had a remedy under the ATS against a foreign national whom the Drug Enforcement Administration had hired to abduct the plaintiff from Mexico. 542 U.S. at 697–98. The Court explained that although the ATS is a "jurisdictional statute creating no new causes of action," the "historical materials" indicate it "was intended to have practical effect the moment it became law" in 1789. *Id.* at 724. Accordingly, the Court concluded, "The jurisdictional grant" in the ATS "is best read as having been enacted on the understanding that the common law would provide a cause of

action for" a "modest number of international law violations," including at least "Blackstone's three primary offenses: violation of safe conducts, infringement of the rights of ambassadors, and piracy." *Id.* Because nothing between the enactment of the ATS and our modern case law "has categorically precluded federal courts from recognizing a claim under the law of nations as an element of common law," the Court added that federal courts today may consider "new cause[s] of action" under the ATS, but only with "great caution." *Id.* at 724–28.

The Supreme Court also went on, however, to caution that its decision should not be read as "imply[ing] that every grant of jurisdiction to a federal court carries with it an opportunity to develop common law." *Id.* at 731 n.19. Indeed, the Court expressly distinguished the ATS — under which a cause of action for a violation of the law of nations could be recognized — from § 1331, stating: "Section 1350 [i.e., the ATS] was enacted on the congressional understanding that courts would exercise jurisdiction by entertaining some common law claims derived from the law of nations," whereas federal-question jurisdiction pursuant to § 1331 was not "extended subject to any comparable congressional assumption"; indeed a "more expansive common law power related to 28 U.S.C. § 1331" may not be "consistent with the division of responsibilities between federal and state courts after *Erie*." *Id*.

Accordingly, following the Supreme Court's guidance in *Sosa*, we hold the Rahims do not have a cause of action cognizable under § 1331 for an alleged violation of federal common law. The district court correctly so held in dismissing this aspect of their complaint.

11

### III. Conclusion

For the foregoing reasons, the judgment of the district court is

*Affirmed.*